# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

KATICA SUDAC, on behalf of
herself and her minor child,
MARINA SUDAC, and

KATICA SUDAC, Administrator
of The Estate of Tomislav "Tomi"
Pevac,

|  |  |
|---|---|
| Plaintiffs, | CIVIL ACTION<br>No. 03-2520-JWL |

    vs.

TRUNG HOANG, et. al,

      Defendants.


## MEMORANDUM AND ORDER

Plaintiff Katica Sudac brings this action on behalf of herself and her minor daughter, Marina Sudac, and

in her capacity as administrator of the estate of her son, Tomislav Pevac, pursuant to the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the Rehabilitation Act of 1973 ("Rehabilitation Act"),

29 U.S.C. § 794; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Kansas Wrongful Death Act,

K.S.A. § 60-1901 et seq.[1]  As a result of the shooting death of Tomislav Pevac, plaintiff seeks compensatory

and punitive damages, as well as injunctive relief, from defendants Trung Hoang, Ron Miller, and the Unified

Government of Wyandotte County/Kansas City, Kansas ("Unified Government").

---

[1]    The case was transferred to the undersigned judge after the death of Judge G. Thomas VanBebber.

This action is before the court on defendants' motion for summary judgment (Doc. 47).  For the reasons set forth below, defendants' motion is granted.

## I.  Factual Background

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in a light most favorable to plaintiff.

Tomislav Pevac, born on October 8, 1982, lived with his mother, Katica Sudac, and sister, Marina Sudac, at their home in Kansas City, Kansas.  In July 2000, Tomislav was admitted to the Providence Medical Center after he threatened to kill himself with a knife.  At that time, doctors at the Providence Medical Center prescribed Tomislav two medications, including Prozac.  Katica Sudac testified by deposition that Tomislav was "okay" as long as he was taking his medications.  In particular, she stated that he acted peacefully and was nice to her.[2]

On the night of September 20, 2001, Tomislav, Katica, and Marina were at their home when Tomislav became upset, tearing a calendar and hitting the wall.  While Katica and Marina were sitting on the couch, Tomislav entered the room holding a knife.  Fearing that Tomislav might kill them, Katica grabbed Marina and they went across the street to the home of their neighbor, Mike Sestric.  Katica informed Mr. Sestric that Tomislav had a knife and that she was afraid he might kill them.  Mr. Sestric called the police.

Shortly before 9:00 p.m. that evening, Trung Hoang and Chad Erwin, police officers employed by the Unified Government police department, were dispatched to a domestic disturbance at 527 Sandusky, Kansas

---

[2]     According to Katica Sudac, her son had stopped taking his medications two or three months before his death.

2

City, Kansas.[3]  Officer Erwin arrived at the scene first.  From his patrol car, he talked to Mr. Sestric, who advised him that a Croatian mother and daughter came to his home to get away from a disturbance at 527 Sandusky.  Mr. Sestric told him that the mother's nineteen-year-old son was causing damage to the house. During Officer Erwin's conversation with Mr. Sestric, a man came running up to his patrol car.  The man stated that he lived next door to 527 Sandusky and that the son was in his backyard, had a knife, and attempted to lunge at him.  Officer Erwin then communicated over the air that the suspect was a Croatian male armed with a knife.

At some point, Officer Erwin looked in his rearview mirror and saw Tomislav standing in the middle of the street, approximately twenty feet behind his patrol car.  Officer Erwin exited his car, and turned toward Tomislav, who was holding a large kitchen-type knife in his right hand.  Officer Erwin asked Tomislav what was going on, but he did not respond.  He then asked Tomislav, "Drop the knife for me, drop the knife."  Officer Erwin stated in his affidavit that Tomislav did not comply with his request; rather, Tomislav "had no expression on his face and was staring like he was in a daze."

Officer Erwin then advised over his radio for Officer Hoang to "step it up" because the suspect on the scene had a knife.  Shortly thereafter, Officer Hoang turned onto Sandusky.  He stopped his patrol car in the middle of the street so that Tomislav was between Officer Erwin and him.  Officer Erwin informed him over the air that the suspect was standing right there in the middle of the street.  When Tomislav saw Officer Hoang's patrol car, he started to run west, in Officer Hoang's direction, along the north side of the street.  As a result, Officer Hoang exited his patrol car, took out his baton, and ran parallel to Tomislav in an effort to cut him off.

---

[3]     Prior to September 20, 2001, Katica Sudac never had any conversations with police officers about any of Tomislav's problems.  Thus, the officers had no reason to know of Tomislav's mental health history.

Officer Erwin followed.

The two officers chased Tomislav to an alley between Sandusky and Tauromee Street. Officer Hoang caught up to Tomislav before Officer Erwin did. As Officer Hoang came running toward Tomislav, Tomislav turned and lunged at Officer Hoang with the knife. Officer Hoang stepped back, put his baton away, and drew his gun. Officer Erwin arrived and also drew his gun. Both officers pointed their guns at Tomislav and ordered him to drop the knife. Tomislav did not drop the knife; instead, he began to walk backwards down the alley. Officers Hoang and Erwin followed and continued to order Tomislav to drop the knife. Officer Hoang stated in his affidavit that it was getting dark and the street lights were on, so Officer Erwin shined a flashlight on Tomislav's face. Officer Hoang testified by deposition that the two officers maintained a distance of ten to fifteen yards as they followed Tomislav down the alley.[4]

On several occasions while in the alley, Tomislav stopped, took a half step forward, lunged towards Officers Hoang and Erwin, and then continued to walk backwards. After the second or third lunge, Officer Erwin holstered his weapon, removed his pepper spray, and sprayed Tomislav in an attempt to disable him so the officers could disarm him. Officer Erwin stood ten to fifteen feet away from Tomislav when he sprayed him. The spray had no effect, so Officer Erwin put it away and took out his gun again.

Once Tomislav exited the alley onto Tauromee, he turned and began walking east down the street. Both officers followed Tomislav, maintaining a distance of eight to ten feet. They continued to plead with him to drop the knife. At some point, the officers noticed two people getting out of a car on the north side of Tauromee just as Tomislav was passing by. Officer Erwin ordered the people to get back inside the car and

---

[4]     Officer Hoang later changed "yards" to "feet" in an errata sheet, citing the reason for the correction as "accuracy."

lock the doors.  The officers moved closer to Tomislav because they were concerned that he might take one of the people inside hostage.  Eventually, Tomislav stopped behind the car (Officer Hoang estimates two or three feet, while Officer Erwin states fifteen feet), near the curb on the north side of Tauromee.

At this point, the accounts of the events differ in some respects.  First, Officer Hoang testified in his deposition that he was five to six feet from Tomislav when Tomislav stopped and that he again ordered Tomislav to drop the knife.  Officer Hoang stated that Tomislav's eyes hardened and fixed on him, and that Tomislav raised the knife above his shoulder, stepped forward, and lunged at him from five feet away.  Officer Hoang testified that he thought Tomislav intended to kill him, so he fired three consecutive shots at the center of Tomislav's body and Tomislav fell to the ground backwards.  Next, Officer Erwin stated in his affidavit that when Tomislav was about fifteen feet behind the car, "he ran toward Officer Hoang with the knife as if to stab him."  Officer Erwin believes that Tomislav was about three feet away from Officer Hoang when Officer Hoang fired the shots.  Finally, Ron Covey, an independent witness, signed an affidavit regarding his version of the events.  On the evening in question, Mr. Covey states that he was at his residence on Tauromee Street when he saw a young man walking backwards on Tauromee Street followed by two officers with their flashlights and guns pointed at him.  He claims that the two officers pursued the young man at a walking pace until the young man backed to a point about a house or a house and a half east of his residence.  Mr. Covey noticed the young man with "something in his right hand which he held with his arm extended down along his right side."  Mr. Covey states that when the young man stopped, he "began to elevate his right hand a little bit."  Before the young man's "right hand got as high as his waist," Mr. Covey states that the officers fired three shots at a distance of six to ten feet from the young man.  Mr. Covey asserts that at no time while the young man was on Tauromee Street did he ever see him "raise the object in his right hand above waist level" or "lunge or run at

the officers."

It is uncontroverted that after Tomislav fell to the ground, Officer Hoang holstered his gun, walked over to Tomislav, and kicked the knife out of his hand.  The officers then handcuffed Tomislav.  Officer Erwin immediately got on his radio and asked for an ambulance and a supervisor.  Tomislav died as a result of the gunshot wound to his chest.  During the events in question, Katica Sudac stayed inside Mr. Sestric's house; she was later informed that her son had been shot.

## II.  Standard of Review

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Lifewise Master Funding v. Telebank, 374 F.3d 917, 927 (10th Cir. 2004).  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Thom v. Bristol-Myers Squibb Co., 353 F.3d 848, 851 (10th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." Id. (citing Anderson, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. Id. (citing Celotex, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial

may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.  Id. (citing Fed. R. Civ. P. 56(e)).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."  Diaz v. Paul J. Kennedy Law Firm, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.  Discussion

#### A.  ADA and Rehabilitation Act

First, plaintiff Katica Sudac, in her capacity as administrator of Tomislav Pevac's estate, claims that defendant Unified Government violated Title II of the ADA and Section 504 of the Rehabilitation Act when it failed to reasonably accommodate Tomislav Pevac, who suffered from severe depression, when attempting to take him into custody.  In particular, plaintiff asserts that defendant Hoang and Officer Erwin should have accommodated Tomislav by learning more about the reasons for his behavior and by utilizing their radios to summon a person knowledgeable in dealing with mentally ill people and a supervisor with access to less lethal munitions.  Moreover, plaintiff believes that defendant Unified Government could have provided training to its officers to deal with Tomislav's disability.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefit of the services, programs, or activities of

a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The statute defines

a "public entity" as "any department, agency, special purpose district, or other instrumentality of a State or

States or local government." Id. § 12132(1)(B). Similarly, Section 504 of the Rehabilitation Act states that

"[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).[5] "Because the ADA sets

forth the same remedies, procedure, and rights as the Rehabilitation Act, . . . claims brought under both statutes

may be analyzed together." Thompson v. Williamson County, 219 F.3d 555, 557 n.3 (6th Cir. 2000) (citation

omitted); see also Hainze v. Richards, 207 F.3d 795, 799 (5th Cir. 2000) ("Jurisprudence interpreting each

section is applicable to both.").

      For plaintiff to prevail, she must establish that Tomislav: (1) was a qualified individual with a disability;

(2) he was either excluded from participation in or denied the benefits of some public entity's services,

programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion,

denial of benefits, or discrimination was by reason of Tomislav's disability. Gohier v. Enright, 186 F.3d 1216,

1219 (10th Cir. 1999) (citations omitted). The court concludes that plaintiff's claim fails as a matter of law.

      As a starting point, the court is guided by the Tenth Circuit's decision in Gohier v. Enright. In Gohier,

the Tenth Circuit confronted the issue of "whether a person with a disability can state a claim under the ADA

---

[5]     Defendant Unified Government does not dispute that it is a "public entity," or that the alleged "program or activity" received Federal financial assistance.

based on police conduct in an arrest or investigation." Id. at 1220.[6]  The court discussed two potentially viable

theories recognized by other federal courts:  the wrongful-arrest theory; and the reasonable-accommodation-

during-arrest theory.  Id. at 1221.  The wrongful-arrest scenario occurs when a law enforcement officer arrests

an individual after incorrectly perceiving the effects of an individual's disability as illegal conduct.  Id. at 1220-

21 (citation omitted).  In contrast, the reasonable-accommodation-during-arrest theory is based on a proper

investigation or arrest of a person "with a disability for a crime unrelated to that disability."  Id.  The contention

is that the law enforcement officer "failed to reasonably accommodate the person's disability in the course of

investigation or arrest, causing the person to suffer greater injury or indignity in that process than other

arrestees."  Id. (citations omitted).

Under the facts of Gohier, the defendant, Officer Enright, responded to a dispatcher's request to

investigate a report that a man, later identified as Lucero, had been damaging vehicles with a foreign object.

Id. at 1217.  When Enright reached the vicinity of the alleged incidents, he saw Lucero walking down the

middle of the street.  Id.  He pulled over his patrol car and turned on his highbeams and emergency lights.  Id.

After he exited his car, Enright asked Lucero to talk to him, but Lucero continued to walk down the street.

Id. at 1218.  When Enright ordered Lucero to stop, Lucero turned around, put his right hand behind his back,

and began quickly walking toward Enright with a "'crazed and wild-eyed'" expression.  Id.  Enright drew his

gun and twice ordered Lucero to show his hands.  Id.  Lucero continued to advance, raised his right hand, and

began swinging an object in his right hand with a stabbing motion.  Id.  Enright retreated behind his car and

ordered Lucero to drop the object.  Id.  Lucero advanced to the driver's side of the patrol car and began to

---

[6]     Gohier used the term "arrest" to include arrests, "investigations potentially involving an

arrest," and "violent confrontations not technically involving an arrest."  Id. at 1220 n2.

open the door.  Id.  At that point, Enright moved to stop Lucero.  Id.  In response, Lucero stepped or lunged

toward Enright and made a stabbing motion with the object.  Id.  Enright shot Lucero two times, killing him.

Id.

One of the issues presented to the Tenth Circuit was whether the plaintiff, the representative of Lucero's

estate, could amend her complaint to add a claim under Title II of the ADA.  Id. at 1217.  Specifically, the

plaintiff alleged that the defendant city failed to protect Lucero in light of his disability, paranoid schizophrenia.

Id.  The Tenth Circuit determined that the wrongful-arrest theory did not apply because Enright did not

misperceive any lawful conduct caused by Lucero's disability as criminal activity and then arrest Lucero for that

conduct.  Id. at 1221.  Rather, the court observed that Lucero's activity was unlawful and that Enright used

force not to effect an arrest, but in self-defense.  Id.  As to the reasonable-accommodation-during-arrest

theory, the court commented that the plaintiff might have alleged that Title II of the ADA required the defendant

city "to better train its police officers to recognize reported disturbances that are likely to involve persons with

mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their

disability."  Id.  But because the plaintiff "affirmatively disclaimed reliance" on the reasonable-accommodation-

during-arrest theory, the court declined to express an opinion as to the theory's application to the facts of the

case.  Id.  As a result, the Tenth Circuit expressly stated that it remained "an open question in this circuit

whether to adopt either or both [theories]."  Id. at 1221.  The Tenth Circuit, however, did clarify "that a broad

rule categorically excluding arrests from the scope of Title II . . . is not the law."  Id.

The Fifth and Sixth Circuits have addressed the issue under similar circumstances to the present case,

and both courts have held that reasonable accommodations are not required when the suspect the police are

attempting to arrest creates an exigency by threatening officers or civilians.  See Hainze v. Richards, 207 F.3d

795 (5th Cir. 2000); Thompson v. Williamson County, 219 F.3d 555 (6th Cir. 2000).

In Hanize v. Richards, a woman called 911 requesting that the police transport her suicidal nephew, plaintiff Kim Michael Hainze, to a hospital for mental health treatment. 297 F.3d at 797. The woman advised the 911 dispatcher that Hainze was under the influence of alcohol and anti-depressants, carrying a knife, and threatening to commit suicide. Id. Three police officers with this information responded to the woman's request and traveled to a convenience store where Hainze was located. Id. Upon arrival, the officers observed a man, believed to be Hainze, standing beside a truck holding a knife. Id. One of the officers exited his vehicle and drew his gun, and ordered Hainze to step away from the truck. Id. Hainze responded with profanities and started walking towards the officer. Id. The other two officers then exited their vehicles with their guns drawn. Id. The first officer twice ordered Hainze to stop, but Hainze ignored him. Id. When Hainze was within four to six feet of the first officer, the officer fired two shots into Hainze's chest. Id. The officers immediately called EMS and Hainze survived. Id.

Relevant to this lawsuit, Hainze sought relief under Title II of the ADA and Section 504 of the Rehabilitation Act, alleging that the defendant county "failed to reasonably accommodate his disability by 'failing and refusing to adopt a policy protecting the well-being of [Hainze], as a person with a mental illness in a mental health crisis situation, thus resulting in discriminatory treatment from [the] sheriff's deputies.'" Id. at 801. Hainze also maintained that the officer that shot him, in contravention of the officer's mental health training, used excessive force to restrain him, as opposed to other less lethal means to defuse the situation. Id. at 800.

After thoroughly discussing Gohier, the court observed that the Tenth Circuit did not answer whether a cause of action existed under the "reasonable accommodation theory" for the failure to train officers "to investigate and handle situations involving mentally ill individuals in a manner that reasonably accommodates

11

their disability." Id. (citing Gohier, 186 F.3d at 1222). The Fifth Circuit answered in the negative, holding that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." Id. at 801. The court reasoned:

> Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and nearby civilians, would pose an unnecessary risk to innocents.

Id. In sum, the Fifth Circuit concluded that requiring law enforcement officers to use less than reasonable force to defend themselves and others, or to pause and consider alternative courses of action while making split-second decisions, was not the purpose of Title II's "reasonable accommodation" provisions. Id. at 801-02.

Similarly, in Thompson v. Williamson County, Robin Thompson called 911, requesting assistance because his mentally handicapped brother, Charles Thompson, was threatening their father with a machete. 219 F.3d at 556. When Officer Gooding and Sergeant Brady arrived at the scene, they were informed that Charles had disappeared into the woods behind the residence. Id. The officers could not find Charles, and told the Thompson family that they would return if needed. Id. Later on, Robin called 911 again, stating that Charles had returned to the home with two machetes. Id. Officer Gooding returned to the Thompson home, carrying his shotgun with him as he walked toward the house. Id. Robin told Officer Gooding that Charles was behind the house. Id. When Officer Gooding attempted to peer behind the house, Charles spotted him and began coming toward him with both machetes. Id. Despite Officer Gooding's order for Charles to drop his weapons, Charles raised one of the machetes as if to throw the weapon and Officer Gooding shot and killed him. Id.

Charles Thompson's parents filed suit, alleging that Charles was a "qualified individual with a disability" who was denied emergency medical services in violation of Title II of the ADA and the Rehabilitation Act. Id. at 557. The Sixth Circuit held that the claim failed, determining that the plaintiffs "failed to produce any evidence that [Charles] was denied either access to a public service, or if he was, that such denial was because of his disability." Id. (citation omitted). The court observed that it was necessary for Officer Gooding to disarm Charles before he could be taken to a medical facility. Id. To this end, the court found that Officer Gooding's failure to disarm Charles was the result of Charles's threatening behavior with a deadly weapon, not Officer Gooding's inadequate training with mentally disabled individuals. Id.

The court finds Hainze and Thompson persuasive. Neither decision suggests that arrests should be excluded categorically from the scope of Title II of the ADA and the Rehabilitation Act. Rather, both decisions recognize that officers should not be expected to make reasonable accommodations when faced with exigent circumstances, i.e., while attempting to arrest an individual who poses an immediate threat to officers or nearby civilians. Here, such exigent circumstances existed, and the court therefore rejects plaintiff's reliance on a reasonable-accommodation-during-arrest theory.[7] Tomislav's conduct with a knife was a serious threat to defendant Hoang, Officer Erwin, and the residents of Tomislav's neighborhood. Adopting the rationale of Hainze, the court holds that Title II of the ADA and Section 504 of the Rehabilitation Act did not apply while the officers attempted to disarm Tomislav and otherwise secure the scene. Alternatively, under Thompson, the court concludes that any alleged denial of benefits or services occurred because of Tomislav's threatening

_____

[7]     The wrongful-arrest theory has no application to the facts of this case.

behavior, not the officers' actions.[8]

## B. Section 1983

### 1.  Fourth Amendment Claim Against Defendant Hoang

Next, plaintiff Katica Sudac, in her capacity as administrator of Tomislav Pevac's estate,  claims that defendant Hoang[9] deprived Tomislav of his Fourth Amendment right to be free from an unreasonable seizure by using force that was objectively unreasonable in light of the facts and circumstances confronting him. Specifically, plaintiff alleges in the pretrial order that defendant Hoang used excessive, lethal force against Tomislav; deliberately escalated the conflict with Tomislav instead of summoning qualified assistance; failed to follow established written policies and training appropriate to the circumstances; and refused to recognize and appropriately respond to Tomislav as a mentally disabled person seeking to end his life through the hands of another.  Defendant Hoang responds that he is entitled to qualified immunity because the force he used was objectively reasonable and it would not have been clear to a reasonable officer in his position that the force used was unlawful.  He also separately disputes each of plaintiff's contentions from the pretrial order.

### a.  Qualified Immunity Standard

Under certain circumstances, the affirmative defense of qualified immunity shields public officials from individual liability in actions brought under 42 U.S.C. § 1983.  Harlow v. Fitzgerald, 457 U.S. 800 (1982).

---

[8]      Of note, it is uncontroverted that neither defendant Hoang nor Officer Erwin possessed knowledge that Tomislav suffered from a mental disability.

[9]      Plaintiff sued defendant Hoang in both his official and individual capacities.  The court dismisses plaintiff's § 1983 claim against defendant Hoang in his official capacity because that claim is duplicative of his § 1983 claim against defendant Unified Government.  See Watson v. Kansas City, Kan., 857 F.2d 690, 695 (10th Cir. 1988) (citations omitted) ("A suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same.").

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001).

Once a defendant asserts a qualified immunity defense, the court employs a two-part test. Under the first of the two-part qualified immunity test, the court must determine whether the facts alleged by a plaintiff, taken in the light most favorable to him or her, show that the conduct of a defendant violated a constitutional right. Hope v. Pelzer, 536 U.S. 730, 736 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). If a plaintiff fails to meet the threshold burden of demonstrating a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201. If, on the other hand, a plaintiff's factual allegations amount to a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established at the time of the defendant's unlawful conduct such that a reasonable person in the defendant's position would have known that the alleged conduct violated the federal right." Id.

### b. Excessive Force

A plaintiff's § 1983 claim that law enforcement officers "used excessive force–deadly or not–in the course of an arrest . . . or other 'seizure' of a free citizen" is evaluated under the Fourth Amendment's reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). This requires a determination "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396 (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)).

"An officer's use of deadly force in self-defense is not constitutionally unreasonable." Romero v. Bd. of County Comm'rs, 60 F.3d 702, 704 (10th Cir. 1995) (citing Tennessee v. Garner, 471 U.S. 1, 11 (1985)).

15

Deadly force is justifiable under the Fourth Amendment "if a reasonable officer . . . would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995) (citing Graham, 490 U.S. at 396; Garner, 471 U.S. at 11). "The reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004) (citing Sevier, 60 F.3d at 699). Thus, a court's inquiry includes "not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force." Allen v. Muskogee, 119 F.3d 837, 840 (10th Cir. 1997) (citing Sevier, 60 F.3d at 699); see also Jiron, 392 F.3d at 415 (citation omitted) (stating that "'mere negligent actions precipitating a confrontation . . . are not actionable under § 1983'"); Romero, 60 F.3d at 705 n.5 (recognizing that officers' "conduct prior to the suspect's threat of force may be relevant to the reasonableness inquiry if the conduct is 'immediately connected' to the suspect's threat of force"). In short, the law does not require police officers to utilize "alternative, less intrusive means if their conduct is objectively reasonable." Jiron, 392 F.3d at 414 (citing Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)).

Defendant Hoang argues that a reasonable officer in his position had probable cause to believe that Tomislav's actions constituted an immediate threat of serious physical harm. He maintains that Tomislav actively resisted arrest by walking away from the officers, lunging at them as they pursued him down the alley, and refusing to comply with their repeated requests to drop the knife–all of which, he contends, provided an inference that Tomislav thought about using the weapon. Defendant Hoang claims that he shot Tomislav when he lunged at him with a knife from five feet away, and that his use of force was objectively reasonable under

the circumstances.

In response to plaintiff's other contentions in the pretrial order, defendant Hoang states that plaintiff has not identified what established written polices and training appropriate to the circumstances he failed to follow. Next, as to plaintiff's argument that he refused to recognize and appropriately respond to Tomislav as a mentally disabled person, defendant Hoang points out that it is uncontroverted that he did not know that Tomislav was mentally disabled. Finally, defendant Hoang disputes that he escalated the conflict. Instead, he states that he attempted to de-escalate the conflict by repeatedly asking Tomislav to put down his knife and maintaining a distance of ten to fifteen feet from Tomislav while following him down the alley. Defendant Hoang claims that he closed the distance between himself and Tomislav out of a concern for safety when Tomislav neared two people getting out of an automobile.

On the other hand, plaintiff argues that there is a genuine dispute about Tomislav's conduct on the night of September 20, 2001. Plaintiff acknowledges defendant Hoang's claim that he shot Tomislav after Tomislav raised the knife above his shoulder, stepped forward, and lunged at him from a distance of five feet. But plaintiff argues that the inconsistencies between the version of events provided by defendant Hoang, Officer Erwin, and Mr. Covey raise serious questions about Tomislav's actions at the scene. The court disagrees.

Accepting defendant Hoang's perspective of events, the court would conclude that his use of deadly force was objectively reasonable under the circumstances. The real issue in this case, however, is whether defendant Hoang's actions were objectively reasonable in light of Mr. Covey's statements about the events of September 20, 2001, i.e, whether his affidavit is sufficient to raise a genuine issue of material fact.

Defendant Hoang criticizes Mr. Covey's statements, noting that his residence was a "house and a half east" from the shooting, he could only see "something" in Tomislav's right hand, and he stated that "both"

17

officers shot Tomislav.  Defendant Hoang argues that those statements, coupled with the fact that it was dark outside, establish that Mr. Covey was not in a position to testify about the officers' perspective of events.  This argument finds support in a decision by the Fourth Circuit, <u>Anderson v. Russell</u>, 247 F.3d 125 (4th Cir. 2001).

In <u>Anderson</u>, a citizen at a mall reported to the defendant, Officer David Russell, that the plaintiff, Major Maurice Anderson, appeared to possess a gun under his sweater.  <u>Id.</u> at 128.  After Officer Russell observed Mr. Anderson for almost twenty minutes, he believed that he saw a bulge along Mr. Anderson's waistline consistent with a gun.  <u>Id.</u>  When Mr. Anderson exited the mall, Officer Russell and another officer followed Mr. Anderson with their guns drawn.  <u>Id.</u>  The officers ordered Mr. Anderson "to raise his hands and get down on his knees."  <u>Id.</u>  Mr. Anderson initially complied by raising his hands.  <u>Id.</u>  At some point, without explanation to the officers, Mr. Anderson lowered his hands to turn off his walkman radio in his back left pocket.  <u>Id.</u>  Officer Russell believed that Mr. Anderson was reaching for his gun, so he shot Mr. Anderson three times.  <u>Id.</u>  A later search of Mr. Anderson established that he was unarmed.  <u>Id.</u>

With regard to Mr. Anderson's excessive force claim, a jury found that Officer Russell used excessive force, but that he was entitled to qualified immunity.  <u>Id.</u>  In response to Officer Russell's subsequent motion for judgment as a matter of law, the district court ruled that the excessive force claim was properly submitted to the jury because conflicting evidence existed, but held that Officer Russell was entitled to qualified immunity as a matter of law.  <u>Id.</u> at 128-29.  On appeal, the Fourth Circuit held that Officer Russell's use of deadly force did not violate the Fourth Amendment as a matter of law and that the claim was improperly submitted to the jury.  <u>Id.</u> at 129.

Pertinent to this case, the Fourth Circuit refuted Mr. Anderson's claim that a triable issue of fact existed

because of discrepancies involving the speed Mr. Anderson was lowering his hands and the position of his hands when Officer Russell shot him.  Id. at 130.  A witness to the events testified that Mr. Anderson was lowering his hands slowly and they "'were still around head level when he was shot.'"  Id.  The court determined that the discrepancies between the officers' account and the independent witness's account concerning the rate of movement and positioning of Mr. Anderson's hands did not raise a triable issue of fact. Id. at 131.  Specifically, the court reasoned:

> To evaluate excessive force, we view the facts from the perspective of the officers.  In a rapidly evolving scenario such as this one, a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer.  For that reason, minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when, as here, the witness views the event from a worse vantage point than that of the officers.

Id.  at 130-31 (internal citations and citations omitted); see also Gaddis v. Redford Township, 364 F.3d 763, 773 (6th Cir. 2004) (citing Anderson and stating that  "minor conflicts of perception" are insufficient alone to create a genuine issue of material fact as to an officer's credibility).   The Fourth Circuit noted that the independent witness was twenty to thirty feet from the incident, while the officers were only ten feet away; the witness watched the incident from inside the mall; and, at the time Mr. Anderson was shot, the witness's "view of [Mr.] Anderson's hands was obstructed by a partition in the door frame through which he was viewing the incident." Id. at 130.

Following the rationale of Anderson, the court finds that Mr. Covey's affidavit is not sufficient to create a genuine issue of fact as to the objective reasonableness of defendant Hoang's conduct.[10]  While in the alley

---

[10]    The court realizes that Anderson involved a gun, while the weapon in this case is a knife.  The court, however, believes that a knife's ability to be thrown or wielded by its holder places the weapon in a similar dangerous or deadly category for purposes of its analysis.  As a result, the distinction does not make a difference in the court's ultimate conclusion.

between Sandusky and Tauromee, Tomislav lunged at defendant Hoang and Officer Erwin several times with a knife and refused to drop the weapon despite repeated orders from the officers to do so.  This conduct put defendant Hoang and Officer Erwin in a position to justify drawing their guns.  Mr. Covey states that Tomislav, followed by two officers, walked backwards on Tauromee until he stopped and raised "something" in his right hand to a point no higher than his waistline.  Mr. Covey claims that at a distance of six to ten feet away, the officers then shot Tomislav.  From a reasonable officer's perspective, Tomislav's conduct in stopping and elevating the knife at a close range was an aggressive move, especially in light of his actions in the alley, which provided probable cause to believe that Tomislav was a threat of serious physical harm.

The court acknowledges that Mr. Covey declared in his affidavit that he did not see Tomislav "lunge or run at the officers."[11]  Nevertheless, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation."  Graham, 490 U.S.

---

[11]      In Sevier v. City of Lawrence, the plaintiffs sued two police officers for excessive force after the officers shot the plaintiffs' son in their home.  853 F. Supp. 1360, 1365 (D. Kan. 1994).  According to the officers, the son allegedly turned and lunged at one of them with a butcher knife.  Id.  The plaintiffs, however, disputed that their son lunged at the officer.  Id. at 1365 n.5.  Judge Crow, without identifying any specific facts, concluded that "the plaintiffs submitted, albeit narrowly, sufficient facts to demonstrate that genuine issues of material fact preclude summary judgment . . . ."  Id. at 1368.  On appeal, the Tenth Circuit held that it lacked jurisdiction to review a denial of qualified immunity as a result of a finding by the district court that genuine issues of material fact existed.  Sevier v. City of Lawrence, 60 F.3d 695, 700 (10th Cir. 1995).  After reviewing the record, the Tenth Circuit did note that Judge Crow probably based his decision on forensic expert testimony that was not consistent with the officers' account of the events, as well as evidence that the officers acted recklessly in confronting the plaintiffs' son in the way that they did.  Id. at 700-01 & n.10-11.  The court finds the facts and circumstances the officers confronted in Sevier to be distinguishable from the officers in this case.  Additionally, the court observes that the plaintiffs in Sevier witnessed the shooting from the hallway of their home, provided forensic evidence to controvert the officers' account, and offered evidence that the officers acted recklessly before the shooting.  Mr. Covey's affidavit does not warrant the same conclusion reached by Judge Crow.

at 396-97.  Moreover, as defendant Hoang correctly asserts, Mr. Covey viewed the events from a house and a half away at night.  He did not possess the same perspective as an officer pursuing an individual armed with a knife from a distance of six to ten feet away.  Under the totality of the circumstances, defendant Hoang's use of force was objectively reasonable and his assertion of qualified immunity stands.  Thus, it is not necessary to proceed to the second step of the qualified immunity analysis.

### 2.  Remaining § 1983 Claims

Plaintiff also seeks to impose § 1983 liability against defendant Police Chief Ron Miller and defendant Unified Government for the alleged failure to train and supervise their officers in dealing with mentally ill or disabled persons.  The court's conclusion that defendant Hoang did not use excessive force in violation of the Fourth Amendment prevents a § 1983 claim against these two remaining defendants.  See Jiron, 392 F.3d at 419 & n.8 (dismissing § 1983 claims against chief of police, police department, and city after concluding that the acting officer's conduct was objectively reasonable).

### C.  Wrongful Death

Finally, plaintiff Katica Sudac, on behalf of herself and her minor daughter, Marina Sudac, claims that defendant Hoang's negligent, wanton, and willful acts resulted in the wrongful death of Tomislav Pevac under Kansas law.  In particular, plaintiff asserts that defendant Hoang breached his duty to use reasonable force in effecting Tomislav's arrest.  Moreover, plaintiff contends that defendant Unified Government is liable for the negligent acts of defendant Hoang which occurred in the scope of his employment.

K.S.A. § 21-3215 authorizes law enforcement officers to use deadly force.  The statute provides, in relevant part:

A law enforcement officer . . . need not retreat or desist from efforts to make a lawful arrest

21

because of resistance or threatened resistance to the arrest.  Such officer is justified in the use
of any force which such officer reasonably believes to be necessary to defend the officer's self
or another from bodily harm while making the arrest.  However, such officer is justified in using
force likely to cause death or great bodily harm only when such officer reasonably believes that
such force is necessary to prevent death or great bodily harm to such officer or another person
. . . .

K.S.A. § 21-3215(1).  "[T]he burden [is] on the plaintiff to establish the use of excessive force by an arresting

officer." Dauffenbach v. City of Wichita, 233 Kan. 1028, 667 P.2d 380, 386 (1983).  For the same reasons

stated in the resolution of plaintiff's § 1983 excessive force claim, the court concludes that defendant Hoang's

use of deadly force was justified under the circumstances, thereby precluding plaintiff's wrongful death claim.

**IT IS THEREFORE BY THE COURT ORDERED** that defendants' motion for summary judgment

(Doc. 47) is granted.

**IT IS SO ORDERED** this 7th  day of July, 2005.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge


22